W. J. BROWN v. THE CATAWBA LUMBER COMPANY.

*Contract—Breach, Waiver of— Consideration — Trial.*

1. An executory contract of employment may, before the performance of any part of the service or the payment of any money, be discharged by simple agreement or a new agreement may be substituted for it, without consideration other than the mutual acquittance of each other from the old promise; but after the performance of any service or the payment of any part of the promised price, the contract can only be discharged by a promise either under seal or supported by a consideration.

2. An inconsistent verdict or one that, in connection with the pleadings, requires explanation to make it harmonize with the pleadings and evidence, and support a judgment, ought to be set aside when too late to have it reformed by the jury; therefore,

3. Where, in the trial of an action for breach of contract of employment, the contract was admitted but defendant claimed that plaintiff had waived its performance and that a new agreement had been made and two issues were submitted, one as to the existence of the contract (which the jury according to instructions answered in the affirmative) and the other was "Did the defendant wrongfully violate the contract, the plaintiff being in no default," to which the jury answered "no"; *Held*, that the second issue, with the response, not being clear or intelligible, the verdict should have been set aside and a new trial granted on new issues.

BROWN *v.* LUMBER COMPANY.

CIVIL ACTION, to recover damages for breach of contract, tried before *Hoke, J.*, and a jury, at April Term, 1895, of NEW HANOVER Superior Court. The issues submitted were:

"(1) Did defendant, on or about June 5, 1894, contract and agree to give plaintiff employment as a band sawyer? Answer: Yes.

"(2) Did defendant wrongfully violate such contract, the plaintiff himself being in no default? Answer: No.

"(3) What damage is plaintiff entitled to recover? [No response to this issue.]"

The plaintiff testified as follows:

"On May 28, 1894, I was sawyer at the Parmelee mills, at Jacksonville, N. C,, at $3 per day, straight time; that is, not to be docked for sickness. On June 1, 1894, I resigned my place, and went to Hickory, N. C. Was induced to do this by letter from defendant company, offering me employment at $4 per day. This letter was written to me in answer to a telegram which I sent to the defendant, offering my services as a band sawyer. Telegram was as follows: 'Will take the band for $4 per day.' The letter, dated May 30, 1894, is as follows: 'Your message of the 28th received. We would not agree to pay you $4 a day, unless you would guarantee an average of 35 M of I boards per day. We have an A 1 filer. Our mill is run by water power. The mill is speeded up to its full capacity, and, if you are the man your telegram makes out to be, you can earn $4 per day. If the mill will average 30 M per day, we will pay you $3, if 25 M, $2.50. If you wish to come under these conditions, and have had experience in white pine and poplar sawing, all right. We now have over five million feet of logs. If you expect to come, wire answer, as there are a good many applicants for the place. [Signed] Catawba River Lumber Co., F. R. Whiting, Sec.' I wired answer that I would be there on the 4th or 5th of June.

Went to Hickory, and reached there about 1 p. m. Monday, 5th. Went out to the mill. Didn't see Whiting. While there I saw there were no logs at the mill. On returning I met Whiting on the road, and he said he would go to the hotel to see me at 9:30 that night. He did not come. Next day I went to the mill, saw Whiting, and Whiting said : 'How long do you want to wait; ten days?' I said 'No ; I didn't come here to loaf'; and he said 'We haven't any logs here to-day, and will pay you $1.50 until the logs, come. That is as much as I have paid any other sawyer.' I replied : 'I came here on the terms of your letter, and those are the terms I will work upon, and no other.' Whiting replied : 'Have you had experience in white pine and poplar sawing?' I said that I had cut some white pine, but not much, but had a great deal of experience in poplar sawing. Whiting then said : 'I will pay you $2 per day, which is more than I ever paid any other sawyer.' I then told Whiting that I had left a $3 job in Jacksonville, had been in business for 15 years, was a competent sawyer, and could cut 35 M if the mill could produce that result. I have had large experience in mills, and am capable of telling what a mill can cut, and, on seeing the machinery and mill of the Catawba Lumber Co., I am sure that it could not be made to produce to exceed 30 M feet. It could not be made to cut 35 M per day with first-class timber. There were no logs there when I arrived. Whiting said they would have plenty of logs within ten days when the river rose, and became in a condition to float them down. I had a contract with the Parmelee-Eccleston Co., at $3 per day, and they promised me that, whenever the band sawyer's place became vacant, I should have it, at $5 per day. At that time I acted as band sawyer when the band sawyer was sick or absent. That is a very responsible place. The band sawyer's position in the Parmelee

117—19

Co. did become vacant within sixty days after I left. When Whiting proposed to pay me $2 per day if I would stay there until they got logs, I declined to take the place, and I borrowed the money with which to return to Wilmington. I spent in cash, as expenses in going to and from Hickory, $40. Upon my return to Wilmington I immediately spoke to the manager of the Parmelee Company, and sought employment, telling them why I left Hickory; also other companies, but without success; and, although I have endeavored to get employment since that time, I have not been able to earn more than $35. Have had experience in sawing poplar, and some in sawing white pine. I sawed some white pine at Taylor's mill, and two or three spars at Northrop's mill." Several witnesses were introduced to corroborate the above statements, and to show that the plaintiff's character was good.

There was testimony as to the competency of plaintiff as a sawyer, and as to the custom, among mill men, of paying employees when mills were idle,—that some paid full wages, others half wages.

Defendant then introduced Whiting, secretary of defendant company, who testified as follows: "I wrote to Jacksonville, to one Ellis, saying that I wanted a band sawyer. Received telegram from plaintiff, Brown, saying he would accept the position at $4. I replied by letter [above set out]. Brown came on the 5th or 6th of June. I saw him, and offered him $1.50 per day until the lumber could get down, which was what the old sawyer was paid when the mill was idle, and he said he would stay at $2 per day, and that was satisfactory. I told the superintendent to put him to work at once. We could have started upon logs we had, and run from three to four weeks. This was about 10 o'clock in the morning. Brown returned about 11 o'clock that day, and said he would like to cancel agree-

ment. I asked why. He said he could do better in Wilmington. I then said it would inconvenience us very much, but finally consented that he might return to Wilmington, and he did go. In a month or two we heard that this suit was started, and wrote to plaintiff, asking him to explain his suit. No reply came. A reply came from Mr. Strange, his attorney. When the letters were written between Strange and the company, the company was without a sawyer, and unable to get one, and in a letter to Strange, written in August, I think, we again offered the place to plaintiff. We never hired by the year; only by the day. Brown was to be paid $4 per day when the logs arrived, if he could turn out 35,000 feet per day. Brown said practically he had no experience in sawing poplar, and never sawed any white pine. The reason we had no logs when Brown came was that, subsequently to writing Brown, on May 30th, an accident had occurred to one of our dams, and we were thereby delayed in floating our logs down. The custom among mill men is for sawyers to get half pay when mill is shut down. The capacity of our mill was reckoned at 40,000 per day, but prior to that time we had not exceeded 33,000. Our present sawyer turns out 35,000 feet per day." Defendant supported testimony of Whiting by introducing deposition of Wilson, which is substantially as follows : "I live in Asheville. My occupation is that of saw filer. Have known defendant about 8 years. Knew plaintiff when he came to Hickory. I was residing on premises of defendant company at Hickory in June, 1894, and was saw filer and assistant foreman of defendant company. I saw Brown about that time at Hickory, and he said something about having resigned a job to accept this one, because he could get better pay with defendant. He engaged board with me, and said he understood the mill had logs, but had found it had none,

and that he had made arrangements to work at reduced rates until the logs arrived. My recollection is he said he agreed to work at $2 per day until they got logs He boarded with me only one day and night, and said he had made up his mind not to work at that pay, and was going home, and did go away. Under Whiting's instructions, I told Brown to begin work, but he refused, and did no work at all. His reason for not working was that he had received a letter from Whiting about his having a lot of logs, and that they did not have them, and he was going home, and sue the company for expenses and salary."

The court charged the jury, among other things, as follows: "That both plaintiff and defendant agree as to substance of contract. Defendant agreed to employ plaintiff at $4 per day as band sawyer, provided plaintiff was able to secure a product from the mill of 35,000 feet of lumber per day, guaranteeing that the mill would produce that result. ' You will therefore find the first issue, 'Yes.' The next issue then is, did defendant violate his contract, plaintiff not being in default? The question is, who broke the contract? If the defendant, you will answer the issue, 'Yes'; if the plaintiff, you will answer, 'No.' Plaintiff says he left because there was no machinery, and the mill was inadequate to produce 35,000 feet per day, and that there were no logs to work upon. Defendant says the machinery and mill were adequate, and plaintiff waived the agreement. If plaintiff was ready and able to perform his contract, and, not having agreed to wait, left because the machinery was not adequate, or because there was no present prospect to obtain the logs, you will answer the issue, 'Yes.' If the machinery was adequate, and plaintiff agreed to wait for logs at reduced wages of $2 per day, and voluntarily left, you will answer the second issue, 'No.' If both parties agreed to set aside the contract,

there was an abandonment by consent, and you will answer the second issue, 'No.' If you so answer, you need not respond to the third issue. But, if you answer the second issue 'Yes,' the plaintiff is entitled to some damage ; that which was in reasonable contemplation of the parties, as to the matters within their knowledge at the time the contract was made, to wit : the cost of the trip to Hickory and return, and compensation to plaintiff for loss of time, at a fair rate of wages, since the injury occurred up to the time of the trial ; but you must not go beyond the time of the trial." The jury found the issues as above set forth. The plaintiff thereupon made a motion for a new trial, upon the grounds (1) that the verdict was contrary to the weight of evidence ; (2) for newly discovered testimony ; (3) for misdirection on the part of the court, in that—"First. The court erred in charging that if plaintiff left because there was no adequate machinery for logs, or that the mill would not produce the number of feet guaranteed, the jury must find the issue, 'Yes'; and insisted that the court should have charged that, even if the machinery was in proper shape, and that the mill was adequate, and that the logs were present, if defendant refused to pay the contract price of $4 per day, the jury must find the second issue, 'Yes.' Second. The court erred in charging that if plaintiff was ready and able to perform his contract, and left, not having agreed to wait, because the machinery was not adequate, and there was no present prospect of obtaining logs, they must answer the second issue, 'Yes,; and insisted that the court should not have inserted in the instructions the qualification 'not having agreed to wait,' and contended that whether the plaintiff agreed to wait or not had nothing to do with the breach of contract on the part of defendant, and there was, therefore, error in inserting that qualification. Third. The court erred in instruct-

ing the jury that if the mill and machinery were adequate, and plaintiff agreed to wait for logs at reduced wages of $2 per day, and voluntarily left, they must find the second issue, 'No'; and contended that the alleged contract to work for $2 per day was either a new contract, made after the first contract was broken, or that it was a modification of the contract in question ; that if it was a new contract, the old contract was broken, and plaintiff was entitled to damages for the breach, and that whether there was a new contract or not could not effect the old contract, or deprive the plaintiff of damages ; that if plaintiff broke the new contract, he was liable to defendant for damages, but this could not deprive him of his remedy for breach of first contract.    If, however, it was a modification of the contract in question, then it was without consideration, and void, and being void, the parties stood upon the same footing that they did before the modification was made, to wit : a breach of contract on the part of defendant, and plaintiff was entitled to damages.    Fourth. That the court erred in charging the jury that if both parties agreed to set aside the contract, this was an abandonment of it, and they must answer the second issue, 'No'; and contended that there was no evidence to support the contention that there had been any abandonment of the contract by the plaintiff." The motion for a new trial was overruled, and the court gave judgment upon the verdict for the defendant, and the plaintiff appealed.

*Mr. W. T. Strange*, for plaintiff, (appellant).
*Messrs. Shepherd & Busbee*, for defendant.

AVERY, J. : The plaintiff brought suit to recover for a breach by the defendant of a mutual agreement theretofore made between them, by the terms of which the defendant

was to pay the plaintiff, as bandsawyer at its mill accord-
ing to the number of feet of boards sawed per day, $4.00 if
the product should be 35,000 feet per day, $3.00 if not
more than 30,000, and $2.50 if not more than 25,000 feet,
and assured the plaintiff that it had on hand over five mil-
lion feet of logs, and that if the mill should be speeded up
to its full capacity it would enable the plaintiff to earn
$4.00 per day, which of course involved producing 35,000
feet of boards.    When the plaintiff arrived and preferred
to carry out his agreement, he was told by the defendant's
manager that the company had no logs there that day and
an offer first of $1.50 per day and subsequently of $2.00
per day was made plaintiff till a new supply of logs could
be floated down the river.

Leaving out of view for the present the question whether
the contract was subsequently waived by the plaintiff, it is
certain that at this stage the defendant was guilty of a
breach of it, as it then stood, in failing to furnish the logs
and give the plaintiff the opportunity to show his skill and
proficiency as a sawyer, by turning off the maximum num-
ber of feet in contemplation of the parties when the agree-
ment was made.    But there was no issue directly involv-
ing the question whether such a breach had been com-
mitted.    The first was as follows.    "Did the defendant, on
or about June 5th, 1894, contract and agree to give plain-
tiff employment as a band-sawyer?"    To this inquiry, which
was too indefinite to determine the specific terms, the court
instructed the jury to respond in the affirmative, because
both parties testified that there was an agreement made by
the telegrams and the letter introduced in evidence.    The
second issue was as follows:    "Did the defendant wrong-
fully violate such contract, the plaintiff himself being in
no default?"    The plaintiff's counsel contended that the
court erred in inserting in the second issue the qualifying

words "the plaintiff himself being in no default," and that
two issues ought to have been submitted to the jury, the
one involving the inquiry whether the plaintiff had been
guilty of a breach of the agreement, and the other raising
the question whether there had been a waiver. It was
contended that there was an admitted breach by the plain-
tiff and that the fact should have been distinctly and sepa-
rately found, but that at all events the two questions
should not have been confused in one issue so as possibly to
mislead the jury.

When the jury responded "No" to this issue with a
double aspect, did they mean to answer in the negative to
the inquiry whether the plaintiff had been without fault?
Or, did they mean to find that the defendant had been
guilty of no breech of contract? The defendant had failed
to comply with. his contract in the first instance and it
would seem that the court might have so told them with
the same propriety that he instructed them that there had
been, according to any view of the evidence, a contract
made.

The well established rule is that an inconsistent verdict,
or one that in connection with the pleadings requires
explanation to make it harmonize completely with the
pleadings and evidence and support a judgment will be
set aside, if it is too late to have it reformed by the jury.
*Allen* v. *Sallinger*, 105 N. C., 339: *Turrentine* v. *Railroad*,
92 N. C., 642; *Porter* v. *Railroad*, 97 N. C., 66; *Mitchell*
v. *Brown*, 88 N. C., 156.

If the jury intended to find in response to this issue that
the defendant d d not violate its contract, the finding was
in conflict with any aspect of the evidence including the
testimony of the defendant's agent Whiting, and the
plaintiff had just ground to complain when the oppor-
tunity was given to pass upon that question and specially

in this mixed issue.   If, being misled and confused by the
language, the jury meant to declare that the plaintiff had
been in no default, then it is plain that if the opportunity had
been afforded them to give intelligible expression through
the issue to their true findings of fact, the plaintiff would
have been entitled to a judgment.   This being an executory
contract and not performed in whole or in part by either,
the parties might without a new consideration, other than
the mutual acquittance of each other from the old promise,
substitute a new agreement for it.   Clark on Contracts, p.
137.   If one person agrees to render service to another at
a stipulated price the contract may be discharged by sim-
ple agreement at any time before the performance of any
service or the payment of money under its terms.   But
after   the   performance   of   any   service   or   the   pay-
ment   of   any   part   of   the   promised   price   the   con-
tract can be discharged only by a promise either under
seal or supported by a consideration.   Clark on Con-
tracts, p. 609.   But, while we concede that such is the
law without citation of numerous authorities adduced ·by
counsel in support of the principle, it must be recollected
that the testimony was conflicting upon this point.   If
the plaintiff was believed, he did not agree to waive the
orginal agreement till the defendant should get an addi-
tional supply of logs, and it could be abrogated only by
mutual consent.   If the jury gave credit to Whiting, the
defendant's agent, there was a mutual understanding that a
new arrangement should be substituted for it.   It being
clearly possible that the jury might have been misled and
the issue with the response not being clear or intelligible,
we think it was the duty of the judge to have set aside the
verdict so that a new trial could be had upon issues that
would enable the court to see plainly that they had under-
stood and discharged their duty and found a verdict clearly

entitling one of the parties to a judgment. We think there was error which entitled the plaintiff to a new trial.

New Trial.